FILED
United States Court of Appeals
Tenth Circuit

October 3, 2007

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

RICHARD ALLEN JOHNSON,

      Defendant-Appellant.

_____

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

JIMMIE ALLEN PERKINS,

      Defendant-Appellant.

No. 06-7074

(D.C. No. CR-03-60-01-WH)
(E. D. Oklahoma)

No. 06-7075

(D.C. No. CR-03-60-02-WH)
(E. D. Oklahoma)

**ORDER AND JUDGMENT**[*]

_____

Before **KELLY, BALDOCK,** and **BRISCOE,** Circuit Judges.

_____

After examining the briefs and appellate record, this panel has determined

unanimously to honor the parties' request for a decision on the briefs without oral

_____

[*]This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

argument.  See Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is, therefore, ordered submitted without oral argument.

Defendants Richard Allen Johnson and Jimmie Allen Perkins were convicted of various criminal counts arising out of their participation in an armed bank robbery.  Both defendants were sentenced to lengthy terms of imprisonment.  On direct appeal, this court affirmed the defendants' convictions, but remanded both cases with directions to vacate the defendants' sentences and resentence them due to a sentencing error.  United States v. Johnson, 168 Fed. Appx. 294 (10th Cir. 2006).  On remand, the district court conducted a resentencing hearing and imposed sentences equal to those originally imposed.  Defendants now appeal their sentences.  We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

The factual and initial procedural histories of this case were previously summarized by this court in affirming the defendants' convictions:

> On the afternoon of March 31, 2003, two men wearing camouflage clothing and masks broke into the home of Lowell and Ima Jean Moore located outside of Keota, Oklahoma.  When Mr. Moore, who was disabled, returned home from fishing, he was confronted by the men and ordered, at gunpoint, to comply with their demands.  Mrs. Moore, who worked at the Keota branch of the First National Bank of Stigler (hereinafter the Keota branch bank), received similar treatment when she returned home that afternoon from work.  The masked men proceeded to question the Moores about the Keota branch bank and indicated that they intended to rob it, threatened to kill the Moores if they did not cooperate, threatened to rape Mrs. Moore, and at one point took steps towards actually raping Mrs. Moore (i.e., ordering her to remove her pants and then unbuttoning and unzipping her pants when she refused to cooperate).  At approximately 9:30

2

p.m. that evening, a third man wearing camouflage clothing and a mask arrived at the Moores' house, stayed for approximately forty-five minutes to an hour, and then left with firearms taken from the bedroom of Mrs. Moore's son. After the third man left the house, the remaining two masked men escorted the Moores to their bedroom and told them they could lay down.

At approximately 4:00 a.m. the next morning, the masked men ordered the Moores out of bed and escorted them outside and into a white van owned by the Moores. The masked men drove the Moores approximately two miles from their home, blindfolded them, and proceeded to drive around for a long period of time, making numerous turns and stopping twice, once to meet up with another vehicle and a second time during which Mrs. Moore was removed by the masked men, interrogated again about the Keota branch bank, and advised of what her role would be in the robbery of the bank. Eventually, the masked men removed the blindfolds from the Moores, ordered Mr. Moore to drive the van, and directed him to the Keota branch bank.

At the Keota branch bank, one of the masked men remained in the van with Mr. Moore while the other escorted Mrs. Moore, who had keys to the bank, inside. In accordance with the masked man's directions, Mrs. Moore turned off the bank's alarm system and video camera, and then opened the bank's vault. The masked man removed a bag of money from the vault (totaling $29,300), left the bank with Mrs. Moore, and returned to the van. Mr. Moore was then ordered to drive as fast as he could out into the country. Outside of Keota on a country road, the masked men ordered the Moores out of the van and directed them to "walk west and don't look back." Supp. Vol. II, at 11. The Moores walked to a nearby house where they called law enforcement authorities. The Moores' van was subsequently found abandoned outside of Keota.

On April 25, 2003, a criminal complaint was filed charging Johnson and Jimmie Perkins with robbing the Keota branch bank, in violation of 18 U.S.C. § 2113(a). (citation omitted). Both men were arrested that same day. During a post-arrest interview with the Federal Bureau of Investigation (FBI), Jimmie Perkins admitted his involvement in the robbery, but asserted that he was forced to participate, under threat of physical harm to himself and his family, by a group of Mexican men. When questioned about Johnson's involvement in the robbery, Jimmie Perkins refused to say whether Johnson was involved or not.

3

On June 11, 2003, a federal grand jury returned an eight-count indictment charging Johnson, Jimmie Perkins, and Anthony Perkins (Jimmie Perkins' son) with various crimes arising out of the robbery of the Keota branch bank. (citation omitted). Count I charged the defendants with conspiracy to commit armed bank robbery in violation of 18 U.S.C. § 371. Count II charged the defendants with armed bank robbery in violation of 18 U.S.C. § 2113(a) and (c). Count III charged the defendants with hostage taking in violation of 18 U.S.C. § 1203. (footnote omitted). Count IV charged Johnson and Jimmie Perkins with possession of a firearm during the commission of a crime of violence in violation of 18 U.S.C. § 924(c). Counts V and VI charged Johnson with solicitation to commit a crime of violence in violation of 18 U.S.C. § 373. Count VII charged Johnson and Jimmie Perkins with possession of stolen firearms in violation of 18 U.S.C. § 924( 1 ). Finally, Count VIII charged all three defendants with conspiracy to possess a firearm during the commission of a crime of violence in violation of 18 U.S.C. § 924(o).

The case proceeded to trial on December 17, 2003. At the conclusion of the evidence, the jury found the three defendants guilty as charged in the indictment. With respect to defendants Johnson and Jimmie Perkins, the jury also found, in response to a special interrogatory, that they brandished weapons during and in relation to Count IV of the indictment (i.e., the § 924(c) charge).

On May 12, 2004, the district court conducted a joint sentencing hearing for the three defendants. At the government's request, the district court determined it would depart upward in two respects as regards the sentences of defendants Johnson and Jimmie Perkins. First, the district court concluded that their § 924(c) convictions effectively skewed their Guideline ranges lower than they would have been had they not been convicted under § 924(c). In other words, the district court concluded that the sentences for Johnson and Jimmie Perkins "under the Guidelines for violation of Sections 2113(a) and 924(c) might be less severe than had they been convicted of violating only Section 2113(a) with an enhancement for using a firearm . . . ." (citation omitted). Thus, in accordance with Application Note 4 to § 2K2.4 of the Sentencing Guidelines (footnote omitted), the district court chose to calculate Guideline ranges for these two defendants by treating them as if they had not been convicted of violating § 924(c) (and thus in turn enhancing their offense levels for using a firearm during and in relation to the bank robbery). This resulted in an offense level of 38 for Johnson and 36 for Jimmie Perkins, and in turn a Guideline range of 235 to 293

4

months for Johnson and 188 to 235 months for Jimmie Perkins.

Second, the district court found "by a preponderance of the evidence that the combination of the sophistication of the robbery, the duration of the abduction, the use of multiple firearms and making multiple and repeated threats of death to multiple victims, and the sexual assault of Mrs. Moore [we]re aggravating factors present to a degree not adequately considered by the Sentencing Commission in formulating the Guidelines," which in turn caused the case "to differ significantly from the heartland cases covered by the guidelines." (citation omitted). Thus, the district court departed upward by imposing a two-level enhancement to the offense levels of defendants Johnson and Jimmie Perkins.

Ultimately, the district court sentenced the three defendants in the following manner. With respect to defendant Johnson, who the district court found was the leader or organizer of the robbery, the district court imposed a sentence of 324 months, in the middle of Johnson's guideline range of 292 to 365 months. With respect to defendant Jimmie Perkins, the district court imposed a sentence of 293 months, a sentence at the very top of the guideline range of 235 to 293 months. Finally, with respect to defendant Anthony Perkins, the district court imposed a sentence of 188 months, a sentence at the bottom of the guideline range.

United States v. Johnson, 168 Fed. Appx. 294, 298-300 (10th Cir. 2006).

On direct appeal, this court affirmed the convictions of all three defendants, as well as the sentence of defendant Anthony Perkins, but remanded the cases of defendants Johnson and Jimmie Perkins to the district court for resentencing. In doing so, this court concluded that the district court committed plain error in finding that the robbery was "sophisticated" and, in turn, relying on that finding to help support its decision to upward depart from the Guideline range with respect to the sentences for defendants Johnson and Jimmie Perkins. Johnson, 168 Fed. Appx. at 311.

On remand, the government filed a motion essentially asking the district court to

5

impose the same sentences originally imposed. More specifically, the government's motion requested that the district court "determine both defendants['] sentences as if there were no 18 U.S.C. § 924(c) conviction utilizing an alternate sentencing calculation." Johnson ROA, Vol. I, Doc. 136 at 1. The government's motion also asked the district court to impose a two-level upward departure on each defendant based on "the combination of factors" cited in the government's prior motion for upward departure (i.e., extended duration of the offense, use of multiple firearms during the offense, the making of multiple death threats during the offense, and the sexual assault of one of the victims), "excluding sophistication of the robbery . . . ." Id. at 3. According to the government, granting its motion would result in an offense level of 38 and an associated "range of 235-293 months" for defendant Jimmie Perkins, and an offense level of 40 and an associated Guideline range of 292-365 months for defendant Johnson (assuming application of a two-level enhancement for his leadership role). Id. at 4. Both defendants objected to the government's motion.

On August 3, 2006, the district court conducted a resentencing hearing for both defendants. During the hearing, the district court adopted the factual findings it made at the previous sentencing hearing, except for the question of who was "the perpetrator of the sexual assault." Id., Vol. 2 at 10. The district court also made the following, additional factual findings:

> • "defendants chose to abduct Mrs. Moore because she had keys to the bank and was responsible for opening the bank every morning," id. at 33;

6

• "[t]hey abducted her husband to further ensure her cooperation," id.;

• "[t]he Moores were held at gunpoint in their home for 17 hours," id.;

• "[n]o time during the 17 hours after the defendants learned that they could not immediately break into the bank, that they had to wait until morning, did they decide to give up their crime," id.;

• "[d]uring the ordeal, multiple firearms [we]re used by the defendants, repeatedly used, to make threats and stuck in the face of both [victims]," id. at 33-34;

• "[m]ultiple and repeated threats of death by the use of the guns to the Moores and family members were made by the defendants and they were made to coerce the Moores into cooperating and keep that cooperation going for 17 long hours," id. at 34;

• "there is evidence – convincing evidence that one of the defendants threatened to sexually assault Ms. Moore and indeed removed her pants which I think qualifies as a sexual assault, perhaps not technically, but that's pretty close to the court," id.; and

• "the guns stolen from the other family member were likewise brandished or used or would have been a threat as well as the guns simply brought to the scene by the defendants themselves," id.

The district court then concluded as follows:

As to the factors submitted by the government and the sentencing factors set forth in 18 United States Code, Section 3553(a), the court finds by a preponderance of the evidence that the combination of the duration of the abduction, the use and threatening use of the multiple firearms in the commission of the offense, the multiple and repeated threats of death to the Moores, and the sexual assault on Ms. Moore are aggravating factors present to a degree not adequately considered by the Sentencing Commission in formulating the guidelines for bank robbery, which causes this case to differ significantly from the heartland cases covered by the bank robbery guidelines. This is not a smash-and-grab bank robbery. Very few bank robbers – bank robberies last for 17 hours.

In determining the extent of the departure, the court notes that most

7

guideline adjustments are two- or three-level adjustments, which in this case has a significant impact on the sentencing range of the defendants. Therefore, taking into consideration the combination of factors previously described, as well as the offense conduct, need for just punishment, deterrence and protection of the public, the court finds a two-level adjustment is appropriate in this case.

According to the sentencing table in the guidelines manual, this departure enhances the sentencing range to 292 to 365 months for Mr. Johnson and 235 to 293 months for Jimmie Perkins. The sentence imposed by the court in this case will be fashioned in accordance with those sentencing ranges.

Id. at 35-36. With respect to defendant Johnson, the district court imposed a total sentence of 324 months (comprised of 60 months on Count 1, 240 months on each of Counts 2 and 8, 84 months on Count 4, and 120 months on each of Counts 5, 6, and 7, with all of the terms, except for that imposed with respect to Count 4, to run concurrently). With respect to defendant Perkins, the district court imposed a total sentence of 293 months (comprised of 60 months on Count 1, 209 months on each of Counts 2 and 8, 84 months on Count 4, and 120 months on Count 7, with all of the terms, except for that imposed with respect to Count 4, to run concurrently).

II.

### A. Defendant Johnson's appeal - No. 06-7074

The district court, in imposing the two-level upward departures on each defendant, cited a combination of four factors. Defendant Johnson, in his appeal from resentencing, challenges three of the four factors relied upon by the district court, i.e., duration of the abduction, use of multiple firearms, and multiple threats of death. According to Johnson,

8

these three challenged factors "do not survive application of the standards for when a factor considered by the offense guideline can serve as an upward departure ground." Johnson. Br. at 7.

A sentencing court is permitted to depart from the Guidelines after determining a defendant's offense level, criminal history category, and the applicable Guideline range if "the court finds, pursuant to 18 U.S.C. § 3553(b)(1), that there exists an aggravating or mitigating circumstance . . . of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." U.S.S.G. § 5K2.0(a)(1)(A). More specifically, a sentencing court may depart based on circumstances (a) of a kind not adequately taken into consideration by the Guidelines, U.S.S.G. § 5K2.0(a)(2), or (b) present to a degree not adequately taken into consideration by the Guidelines, id. § 5K2.0(a)(3). A sentencing court may also, as was the case here, "depart from the applicable guideline range based on a combination of two or more offender characteristics or other circumstances, none of which independently is sufficient to provide a basis for departure . . . ." Id. § 5K2.0(c). Under these latter circumstances, a departure is warranted "only if" the "offender characteristics or other circumstances" relied on by the sentencing court, "taken together, make the case an exceptional one," and "each such offender characteristic or other circumstance is . . . present to a substantial degree . . . and . . . identified in the guidelines as a permissible ground for departure, even if such offender characteristic or other circumstance is not ordinarily relevant to a determination of whether a departure is warranted." Id. § 5K2.0(c)(1), (2).

9

Generally speaking, when reviewing a district court's application of the Sentencing Guidelines, this court reviews any legal questions de novo and the factual findings for clear error, giving due deference to the district court's application of the Guidelines to the facts. United States v. Pettigrew, 468 F.3d 626, 639-40 (10th Cir. 2006). "In specifically reviewing upward departures, this court employs a four-part test, examining: (1) whether the factual circumstances supporting a departure are permissible departure factors; (2) whether the departure factors relied upon by the district court remove the defendant from the applicable Guideline heartland thus warranting a departure; (3) whether the record sufficiently supports the factual basis underlying the departure; and (4) whether the degree of departure is reasonable." United States v. Wolfe, 435 F.3d 1289, 1295 (10th Cir. 2006). "All of these steps are subject to a unitary abuse of discretion standard." Id. (internal quotation marks omitted).

*1) Duration of the abduction*

Johnson contends that the duration of the abduction was not a proper basis for departing upward "because the [Sentencing] Commission included abduction in the robbery guideline and could foresee that abduction could occupy a period of time outside the time necessary for the robbery." Johnson Br. at 7. He further argues that "[t]he time period [of abduction] in this case was only what was necessary to accomplish the robbery, and abduction did not become an independent criminal objective." Id.

Generally speaking, "abduction or unlawful restraint" is considered by the Guidelines to be an "encouraged" basis for departure. See U.S.S.G. § 5K2.4 ("If a person

10

was abducted, taken hostage, or unlawfully restrained to facilitate commission of the offense or to facilitate the escape from the scene of the crime, the court may increase the sentence above the authorized guideline range."). As noted by Johnson, however, U.S.S.G. § 2B3.1, which establishes the offense level for robbery convictions, expressly takes abduction into account by mandating a four-level increase "[i]f any person was abducted to facilitate commission of the offense or to facilitate escape . . . ." Id. § 2B3.1(b)(4)(A). Further, the district court in this case applied that four-level increase in calculating Johnson's guideline range. Thus, in order for the abduction that occurred in this case to properly justify, in combination with one or more other factors, an upward departure, it must have been "present to a substantial degree . . . ." Id. § 5K2.0(c)(2)(A).

Johnson asserts that "the abduction did not take this case out of the heartland of robberies represented by Guideline 2B3.1." Johnson Br. at 13. In support of that assertion, Johnson argues that "[i]t is foreseeable that robberies may be committed wherein victims are abducted for several hours in order to facilitate the offense." Id. at 12. He also asserts that "[t]he abduction was not for a gratuitous period of time, and ended minutes after the robbery was accomplished." Id. at 13. In other words, he asserts that "[t]he abduction . . . was for the length of time needed to accomplish the robbery," and no more. Id.

The problem with Johnson's arguments is that he is incorrectly relying on the standard set forth in U.S.S.G. § 5K2.0(a)(3), i.e., the requirement that a circumstance be "present in the offense to a degree substantially in excess of, or substantially below, that

11

which ordinarily is involved in that kind of offense." That standard, however, is inapplicable here because the district court did not rely solely on the length of the abduction, but rather relied on the length of the abduction together with three other factors, to impose an upward departure. Thus, although Johnson may be correct in asserting that an abduction lasting seventeen hours could not be considered "substantially in excess of that which is ordinarily involved in" a bank robbery, it does not answer the pertinent question of whether the lesser standard set forth in U.S.S.G. § 5K2.0(c)(2)(A) is satisfied.

After reviewing the record on appeal, we conclude that the length of the abduction does, indeed, satisfy this lesser standard. The evidence presented at trial in this case overwhelmingly established, and Johnson does not dispute, that the abduction of the Moores lasted from approximately 2 p.m. on the afternoon of March 31, 2003, until 7:30 or 8:00 a.m. on the morning of April 1, 2003, or a total of seventeen to eighteen hours. Further, the district court, in citing the length of the abduction as one of the factors it was relying on to impose an upward departure, stated: "Very few . . . bank robberies last for 17 hours." Johnson ROA, Vol. 2 at 36. Notably, Johnson does not directly dispute this conclusion, nor does he seriously dispute that the length of the abduction was, indeed, "substantial." In short, it is clear that the abduction, in terms of length, was present "to a substantial degree," and that the district court properly relied on this factor to impose the upward departure.

12

*2) Multiple firearms*

Johnson next contends that the use of "multiple firearms was not a factor present substantially in excess of the typical case, and does not distinguish this case as rare and exceptional." Johnson Br. at 13. In support of this contention, Johnson notes that (a) there is no evidence "that the intruders were armed with more than one firearm each," id. at 14, (b) the intruders unloaded and ultimately removed from the house the firearms belonging to the Moores, and (c) there is no evidence that weapons were used inside the Moore's vehicle during the robbery episode. In sum, Johnson argues "that this was a garden variety abduction/robbery as far as use or number of weapons was involved."[1] Id. at 14-15.

The initial problem with Johnson's arguments is, again, that he is relying on the more demanding standard set forth in U.S.S.G. § 5K2.0(a)(3), i.e., the requirement that a circumstance be "present in the offense to a degree substantially in excess of, or substantially below, that which ordinarily is involved in that kind of offense," instead of the lesser, "to a substantial degree" standard set forth in U.S.S.G. § 5K2.0(c)(2)(A).

Applying the correct standard, we conclude, as the district court effectively concluded, that the defendants' use of weapons was present "to a substantial degree." As previously noted, the district court at the time of resentencing expressly found that

---

[1] Johnson does not, and indeed cannot, dispute that the use of weapons during the commission of an offense is a permissible ground for departure. See U.S.S.G. § 5K2.6 ("If a weapon or dangerous instrumentality was used or possessed in the commission of the offense the court may increase the sentence above the authorized guideline range.").

"[d]uring the ordeal, multiple firearms [we]re used by the defendants, repeatedly used, to make threats and stuck in the face of both [victims]." Johnson ROA, Vol. 2 at 33-34. In other words, although each of the defendants may only have brandished a single weapon at a time during the course of the abduction, it is uncontroverted that they repeatedly used those weapons over the entire course of the abduction to threaten and coerce the Moores into cooperating. Accordingly, the "use of multiple weapons" was indeed present "to a substantial degree," and thus was properly relied on by the district court in imposing the upward departure.

### 3) Multiple death threats

Lastly, Johnson concedes "that multiple and repeated threats of death were made to the Moores, in order to coerce them into cooperating," but nevertheless argues that "the role of death threats did not set this case apart as the rare case not envisioned by the Sentencing Commission." Johnson Br. at 15. Rather, he argues, "[t]he threats of death were of the usual kind that accompany robberies–comply or be harmed." Id. In sum, he argues that this factor "was not present substantially in excess of what is ordinarily involved."[2] Id. at 16.

---

[2] Johnson does not argue that consideration of multiple death threats as a factor was impermissible under the Guidelines. Although Chapter 5, Part K of the Guidelines does not appear to expressly discuss the use of death threats, it does indicate that "extreme conduct" on the part of the defendant may justify an upward departure. U.S.S.G. § 5K2.8 ("If the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct."). Further, § 2B3.1 of the Guidelines, which specifically addresses robberies, does provide for an enhancement if "a threat of death was made . . . ." U.S.S.G. § 2B3.1(b)(2)(F).

14

Johnson again relies on the wrong standard in making his argument. Rather than relying on the correct, "to a substantial degree" standard set, he instead erroneously relies on the "substantially in excess of" standard. Thus, his arguments fail.

In any event, we conclude after reviewing the record that it was proper for the district court to rely on this factor in imposing the upward departure. At the time of resentencing, the district court found, and Johnson now concedes, that "[m]ultiple and repeated threats of death by the use of the guns to the Moores and family members were made by the defendants and they were made to coerce the Moores into cooperating and keep that cooperation going for 17 long hours." Johnson ROA, Vol. 2 at 34. Thus, whether or not the use of death threats in this case was "substantially in excess of that . . . which ordinarily is involved in th[is] kind of offense," it is clear that death threats were used here "to a substantial degree." In turn, it was proper for the district court to rely on the defendants' repeated use of death threats in imposing the upward departure.

*4) Conclusion*

In conclusion, all three of the factors challenged by Johnson were properly relied on by the district court in imposing the upward departure. Further, it is clear that these three factors, together with the commission of the sexual assault, made this "an exceptional" case for purposes of U.S.S.G. § 5K2.0(c)(1), and Johnson does not argue to the contrary. Thus, we affirm defendant Johnson's sentence.

**B. Defendant Perkins' appeal - No. 06-7075**

Defendant Jimmie Perkins asserts five issues on appeal from his resentencing.

15

*1) Lack of notice of sentencing enhancements*

Perkins first contends that the government violated Federal Rule of Criminal Procedure 32(h) by failing to provide him with adequate notice of its intent to seek enhancements to his base offense level. In particular, Perkins complains that "no information, argument or authority, was ever received from the United States Attorney as to the five sentencing enhancements [ultimately] used [by the district court at the time of resentencing] to increase [his] sentencing range . . . ." Perkins Br. at 25. Likewise, Perkins contends, "[t]he Probation Office gave [him] no" notice of these enhancements prior to the resentencing hearing. Id. at 26. This court "review[s] the District Court's adherence to Rule 32(h) de novo." United States v. Dozier, 444 F.3d 1215, 1217 (10th Cir. 2006).

Rule 32(h), entitled "Notice of Possible Departure from Sentencing Guidelines," provides as follows:

> Before the court may depart from the applicable sentencing range on a ground not identified for departure either in the presentence report or in a party's prehearing submission, the court must give the parties reasonable notice that it is contemplating such a departure. The notice must specify any ground on which the court is contemplating a departure.

Although this statutory language appears to apply only to upward and downward departures, we will assume, arguendo, that Rule 32(h) also encompasses enhancements to a defendant's offense level.[3]

---

[3] In Dozier, a panel of this court held that "Rule 32(h) affords a criminal defendant the right to be notified of any intention by the district court to enhance a sentence and any

(continued...)

16

After Perkins was convicted at trial, the probation office prepared and submitted a PSR recommending the imposition of five sentencing enhancements: (1) a two-level enhancement pursuant to U.S.S.G. § 2B3.1(b)(1) for taking the property of a financial institution; (2) a four-level enhancement pursuant to U.S.S.G. § 2B3.1(b)(4)(A) because a person was abducted to facilitate commission of the robbery; (3) a one-level enhancement pursuant to U.S.S.G. § 2B3.1(b)(6) because firearms were taken from the Moores' house; (4) a one-level enhancement pursuant to U.S.S.G. § 2B3.1(b)(7) because the amount of loss was more than $10,000 but less than $50,000; and (5) a two-level enhancement pursuant to U.S.S.G. § 2B3.1(b)(5) because the offense involved car-jacking (i.e., the taking of the Moores' van). Although Perkins objected to four of these proposed enhancements (he did not object to the two-level enhancement for car-jacking), the district court overruled his objections and imposed all five of the proposed enhancements. On direct appeal, this court, applying a plain error standard of review, overruled Perkins' Booker[4] objection to the enhancements. In doing so, this court concluded, in pertinent part, "that a jury applying a reasonable doubt standard would have found all of the facts underlying the five enhancements . . . ." Johnson, 168 Fed. Appx. at 307. This court

---

[3](...continued)
basis for such an enhancement." 444 F.3d at 1217. This language would seem to suggest that Rule 32(h) does, in fact, apply to sentencing enhancements, as opposed to upward or downward departures. However, Dozier itself involved only an upward departure. Thus, the above-quoted language appears to be dicta. Moreover, the above-quoted language from Dozier appears to be inconsistent with the plain language of Rule 32(h).

[4] United States v. Booker, 543 U.S. 220 (2005).

ultimately remanded Perkins' case for resentencing, however, due to the district court's reliance on an improper factor in imposing an upward departure.

On remand, Perkins filed a "Sentencing Memorandum" arguing, in pertinent part, that a new PSR should be prepared addressing "all sentencing issues . . . that could be raised or considered by the [district] Court . . . ." Perkins ROA, Vol. 1, Doc. 134 at 3. In support of this request, Perkins asserted that he "ha[d] received nothing from the probation officer in this case as to recommendations on the re-sentencing," "d[idn't] know what the Government m[ight] be asking for," and "want[ed] to know in advance what the Court w[ould] consider . . . so that [he] could prepare for the [resentencing] hearing." Id. at 4. The district court conducted a hearing on Perkins' motion, during which Perkins' counsel conceded that a new PSR was unnecessary. Id., Vol. 2 at 8 ("So, you know, I'm not here to create a lot more work and, you know, another Presentence Report, a whole bunch of other investigation. I don't think we need all of that . . . ."). At the conclusion of that hearing, the district court denied Perkins' request for a new PSR, and instead indicated it would rely on the original PSR. Id. at 19. The district court did, however, indicate that the parties could "submit additional objections to the" original PSR. Id. Following this hearing, the government filed a motion requesting that the district court (a) apply an alternate sentencing calculation, and (b) impose a two-level upward departure. Perkins filed an objection to the government's proposed upward departure. Id., Doc. 137. Importantly, Perkins noted, as part of his objections, that he would likely be receiving the same enhancements that were originally imposed by the

18

district court at the original sentencing hearing. Id. at 4-5 (noting that he would likely receive a 6-level enhancement based on the use of firearms); id. at 5 (noting that he would likely receive "a 2 point enhancement because the property of a financial institutional was the object o the offense," "an additional 4 points because the Moores were abducted during the course of the offense," and "an additional 2 points . . . based on the carjacking").

Based upon these facts, Perkins was provided with sufficient notice of the five sentencing enhancements ultimately imposed by the district court at the resentencing hearing. Specifically, the district court indicated on remand that it would rely on the original PSR, which expressly listed each of the five sentencing enhancements. Further, Perkins effectively conceded in his objections to the government's proposed upward departure that he was aware that the five sentencing enhancements would be considered, and likely applied, by the district court. Thus, we conclude there was no violation of Rule 32(h).

*2) District court's factual findings regarding sentencing enhancements*

Perkins next contends that the district court violated his rights by basing each of the five sentencing enhancements on its own factual findings utilizing a preponderance of the evidence standard. In other words, Perkins complains that the sentencing enhancements were neither supported by his own admissions or findings by a jury beyond a reasonable doubt.

Perkins' argument clearly lacks merit. Contrary to Perkins' argument, Booker

19

made clear that sentencing facts need not be proved beyond a reasonable doubt. Rather, as long as a district court applies the Guidelines in an advisory fashion (which the district court in this case clearly did), facts may be proved by a preponderance of the evidence. United States v. Magallanez, 408 F.3d 672, 685 (10th Cir. 2005). That is, provided the sentence imposed by the district court is within the range authorized by the statute under which the defendant was convicted, judicial fact-finding by a preponderance of the evidence does not violate the Constitution. United States v. Crockett, 435 F.3d 1305, 1319 (10th Cir. 2006). We note that Perkins does not assert that his sentence exceeded the statutory maximum. Thus, it was entirely permissible for the district court to make its own factual findings applying a preponderance of the evidence standard, and to utilize those findings to enhance Perkins' base offense level.

*3) The alternative sentencing calculation*

Perkins next focuses upon the district court's adoption of what the parties refer to as "the alternative sentence calculation," and what essentially amounted to an upward departure, proposed by the prosecution and authorized by Application Note 4 to U.S.S.G. § 2K2.4. In particular, Perkins complains that Application Note 4 "provides no method or criteria" for application of the alternative sentence calculation. Perkins Br. at 40. Instead, he argues, "[t]he only direction implicit in this Application Note is that the highest sentence should be meted out – without any consideration of reasonableness." Id. Perkins also appears to suggest that the alternative calculation was inappropriate in light of the district court's (a) application of five enhancements to his base offense level, and

20

(b) imposition of a two-level upward departure based on other circumstances of the offense.

Section 2K2.4 of the Sentencing Guidelines governs the calculation of sentences for offenses involving the "Use of Firearm, Armor-Piercing Ammunition, or Explosive During or in Relation to Certain Crimes." Application Note 4 to § 2K2.4 provides, in pertinent part, that

> [i]f a sentence under this guideline is imposed in conjunction with a sentence for an underlying offense, do not apply any specific offense characteristic for possession, brandishing, use, or discharge of an explosive or firearm when determining the sentence for the underlying offense. A sentence under this guideline accounts for any explosive or weapon enhancement for the underlying offense of conviction . . . .

U.S.S.G. § 2K2.4, comment. n. 4. Application Note 4 does, however, provide the following exception to this general rule:

> In a few cases in which the defendant is determined not to be a career offender, the offense level for the underlying offense determined under the preceding paragraphs may result in a guideline range that, when combined with the mandatory consecutive sentence under 18 U.S.C. . . . § 924(c), . . . produces a total maximum penalty that is less than the maximum of the guideline range that would have resulted had there not been a count of conviction under 18 U.S.C. . . . § 924(c) . . . (i.e., the guideline range that would have resulted if the enhancements for possession, use, or discharge of a firearm had been applied). In such a case, an upward departure may be warranted so that the conviction under 18 U.S.C. . . . § 924(c) . . . does not result in a decrease in the total punishment. An upward departure under this paragraph shall not exceed the maximum of the guideline range that would have resulted had there not been a count of conviction under 18 U.S.C. § . . . § 924(c) . . . .

Id.

Although Perkins argues that Application Note 4 "provides no method or criteria"

for application of the alternative sentence calculation, and thus does not take into account the overall reasonableness of the sentence, his reading of Application Note 4 is incorrect. Application Note 4 simply grants sentencing courts authority to "depart upward to ensure that defendants convicted under both § 924(c) and the underlying crime of violence do not receive more lenient sentences by virtue of the § 924(c) conviction than if they had been convicted of the underlying offense alone." United States v. Banks-Giombetti, 245 F.3d 949, 953 (7th Cir. 2001). In other words, Application Note 4 affords sentencing courts the discretion to decide, in cases such as this, whether the lower or higher sentencing range is more appropriate. To be sure, Application Note 4 suggests, and it is likely to be true, that the higher sentencing range (i.e., the range achieved by upward departing) will usually be more appropriate. Nevertheless, a defendant, such as Perkins, is always free to argue that the lower sentencing range is more appropriate (as Perkins did here), and/or to request a variance below the guideline range ultimately calculated in order to achieve what the defendant believes to be a "reasonable" sentence.

Perkins' other arguments also lack merit. In particular, nothing in Application Note 4 indicates that the alternative sentencing calculation is inappropriate, or should not otherwise be applied, if a defendant has received a certain number or level of enhancements to his or her base offense level. Thus, the fact that the district court applied five enhancements to Perkins' base offense level did not prohibit it from applying the alternative sentencing calculation authorized by Application Note 4. Likewise, nothing in Application Note 4, or any other guideline provision, prohibited the district court from

22

applying a second upward departure pursuant to U.S.S.G. § 5K2.0(c).

*4) The district court's upward departure pursuant to § 5K2.0(c)*

Perkins challenges each of the four factors cited by the district court in imposing the two-level upward departure pursuant to § 5K2.0(c). For the reasons already discussed above in connection with defendant Johnson's appeal, there is no merit to Perkins' challenges to the multiple firearms, multiple threats, and duration of abduction factors. In other words, for the reasons already discussed, the district court properly relied on all three of these factors in imposing the upward departure pursuant to § 5K2.0(c). Thus, that leaves only Perkins' challenge to the sexual assault factor cited by the district court.

Perkins suggests that this is "perhaps . . . the most troubling of all the factors for the upward departure." Perkins' Br. at 45. Although Perkins does not dispute that Mrs. Moore was sexually assaulted, he argues that the assailant "was never identified between the three defendants on trial," and "[t]here was no evidence presented at trial or the first sentencing hearing [that] the other two defendants were aware the assault occurred." Id. Finally, Perkins argues the sexual assault was not a foreseeable act for which he, as the non-assailant, should be held responsible.

As previously noted, § 5K2.0(c) allows a sentencing court to "depart from the applicable guideline range based on a combination of two or more offender characteristics or other circumstances, none of which independently is sufficient to provide a basis for departure . . . ." The application notes to § 5K2.0 define "circumstance" to "include[], as appropriate, an offender characteristic or any other offense factor." U.S.S.G. § 5K2.0,

23

comment. n. 1. Both this circuit and the First Circuit have interpreted this definitional language to mean that "upward departures are allowed for acts of misconduct not resulting in conviction, as long as those acts, whether or not relevant conduct in the section 1B1.3 sense, *relate meaningfully to the offense of conviction*." United States v. Amirault, 224 F.3d 9, 12 (1st Cir. 2000) (emphasis added); accord United States v. Neal, 249 F.3d 1251, 1259-60 (10th Cir. 2001) (adopting the First Circuit's reasoning in Amirault).

Applying that standard here, it is clear that the sexual assault of Mrs. Moore "related meaningfully to" Perkins' "offense[s] of conviction." In particular, it is uncontroverted that the assault occurred while the Moores were held hostage in their own home, and while the three defendants were waiting for the bank to open. Further, the prosecution presented testimony at trial from a former supervisor of defendant Johnson's (Thomas Leon Guinn) who testified that a few weeks prior to the robbery, Johnson indicated he was thinking about robbing a Keota bank by kidnaping a woman who had keys to the bank, and that, as part of his robbery scheme, he intended to threaten to rape or harm the woman. Tr. at 79-81. Based upon this testimony, a reasonable finder of fact could have concluded, applying a preponderance of the evidence standard, that Johnson likewise informed the other two defendants, prior to the actual commission of the crime, about his plan to rape or harm the woman. In turn, then, the sexual assault would clearly fall within the scope of "relevant conduct" under § 1B1.3 because it would have been "reasonably foreseeable" by Perkins. U.S.S.G. § 1B1.3(a)(1)(B). Accordingly, the

24

district court properly relied on the sexual assault in imposing the two-level upward departure pursuant to § 5K2.0(c).

*5) Presumptive reasonableness of the Sentencing Guidelines*

Perkins argues, at length, that "the position of this Circuit as to the presumptive reasonableness of the sentencing guidelines is in error." Perkins' Br. at 49. Perkins' arguments, however, are clearly foreclosed by the Supreme Court's recent decision in United States v. Rita, 127 S.Ct. 2456, 2465 (2007) (approving the presumption of reasonableness adopted by this circuit and others).

We AFFIRM the sentences of both defendants.

Entered for the Court


Mary Beck Briscoe
Circuit Judge